Good afternoon. So today we have the matter of In re James Andre Boles, Ninth Circuit, docket number 14-80100, and this is a hearing requested by Mr. Boles in response to this court's order to show cause why the court should not impose reciprocal discipline based on the suspension order issued by the Nevada Supreme Court. So Mr. Boles, I want to make sure you understand you're entitled to be represented by counsel at this hearing. Do you understand that? All right. I take it that that means you're representing that fool. Okay. I also want you to inform me that the proceedings are being recorded today, and if necessary, you would be able to have access to the recording of these proceedings. I also wanted to explain for you again the scope of the hearing, the limited scope of the hearing, and that is that it affects only your ability to practice in the Ninth Circuit. There's no aspect of this hearing that in any way would review the determinations made in Nevada concerning your ability to practice in the state courts there. I also wanted to mention that the scope of this hearing is limited to the reciprocal question, and that is whether this court should grant what's ordinarily a great degree of determination, and the court will do so unless you bear the burden of showing that you did not receive adequate notice and opportunity to be heard in the state court proceedings, the first element. The second element is that the proof of facts that were relied upon in the state court proceeding were fatally infirm, or third, that there's some other grave reason why the court should not respect the decision of the Nevada Supreme Court. Do you understand all that? All right. So I also wanted to point out that the hearing here, and this reciprocal disciplinary matter, applies only to the second determination by the Nevada Supreme Court, that is the two-year suspension, and not to the first matter, in part because we did not issue an order to show cause that included that first matter, but also because, as I understand it, that period of suspension should by now have elapsed. So I hope that will clarify things for you. So if you don't mind, Mr. Bozell, why don't you approach the microphone. And I want to also mention to you, although this is a small courtroom, and one would think that it would be easy to hear, I would ask that you use the microphone because the sound sometimes gets a little muddled, and it'll help also for the recording process. And before we proceed, because I'm going to be asking you some questions, and I want those answered under oath, I'm going to ask my courtroom deputy to administer the oath at this time. All right. Now, I have reviewed your submissions, and I think I understand your arguments. I have some questions for you. To clarify my understanding, make sure I have your positions right and everything. And so I want to assure you that you need not reiterate things that you've already submitted in writing, because they will be carefully reviewed and considered. And I also, as you know, you have the opportunity that was afforded to you to present evidence and witnesses, some of the evidence you've presented in documentary form, and that's very helpful. I guess at this point, I would like to ask you how you would propose to proceed today in the time that we have for this hearing. Depending on the court's pleasure, I would offer to apply for an infraction, make a consideration. Yes. And as far as it's all right with the court, I'll do it in first person, third person. Yes. No, I think it would be more natural and understandable. That way, are you presenting any other witnesses? Your Honor, I have present with me, and a little heads up, is Deborah Tucker. I may refer to her as my wife, not formally married, and I offer that. I may call her a humor, but at this time, I don't think it's a good idea unless somebody comes up to her. The other witnesses, I preside that they come back, and we'll be able to call them. Okay. Okay. So I understand that you would like to make a narrative explanation of the case as you see it from a factual standpoint. Do you also need time to reiterate the legal arguments you've made? Okay. Do you have an estimate of how much time you will need to do those things? Okay. Okay. You really want that, huh? Well, I'll see what I can do to satisfy your request. All right. So I'm happy to hear everything you have to say. I just do want to assure you that I'm on board with all the basic matters. I understand the outlines pretty well of the factual scenario. So I think your request is reasonable in terms of time, but I just want to make sure that you focus on the most important and critical factual matters that you want to raise. So don't feel like you have to give me a whole lot of background information to set the stage. I think you can go directly to the most cogent points that you have, and I think I can follow you, but I'll make you this deal. I will stop you and ask you if you lose me. How's that? Very good. Okay. So with that said, why don't you proceed with your presentation? And I intended to go into three – excuse me. I have a little problem with scuttering. So I apologize. Don't worry about it. And if you get just a tiny bit closer to that microphone, I'd appreciate it. Okay. But one issue that I would like to address, since we're only addressing the second matter, the two-year suspension, which is actually a continuation of the same alleged conduct, I would ask the Court at least briefly to allow me to go into some of that, both those prior hearings, because I think they're critical to the issue of due process. And due process not only has due notice in hearing, but the aspect of due process as set forth in the Loudermill case, which is the impartial hearing entity. I would like to address that also. So by way of a motion in limine, I'm asking the Court to allow me to do that. Yeah. I think we can dispose of the formalities like that, and you can just go ahead and tell your story. Well, and most of what I have to say is set forth in the record that the Court has, so I'm not going to feed it to that. I would like to address, and I intend to address for the Court, that my entire situation is an ongoing situation, and so there's some things that are so recent that they're not addressed there. But before I go anywhere, as the Court, I'm sure, knows, I also practice in California. I have been licensed in California since 1989, and that raises the issue of any case that I take up in California would be necessary to bring it to the Ninth Circuit. I'm allowed to do so by California, the California bar. However, the bar, if I'm disciplined reciprocally by this Court, then I'd be kind of, I've got one avenue that's still open to me. I intend to be successful in turning back the attack that was carried out in Nevada, so it would put me in a position where I am a California lawyer, but I cannot practice in the Ninth Circuit, even though I'm in good stead with California. And before I waste the Court's time anymore, I mean, perhaps the Court has some sort of indication for me whether my status as an admitted, good-standing lawyer in California not prevent some attack by Nevada, where I will not be bringing cases through the Nevada system, because obviously I can't practice there, and I don't intend to practice there any longer. So, if I may. Our rules are fairly clear that if you are suspended by any bar, the Federal, inside, outside the Ninth Circuit, the rule of reciprocal discipline applies. But that does lead me to ask my first question of you, and that is, what is the status of disciplinary, reciprocal disciplinary proceedings in California? I've had a hearing in front of a state bar court judge. They adopted, reciprocally, the order of the Nevada Supreme Court, and recommended a six-week suspension. I am on appeal here in San Francisco to the next level, and that has not been set. Is that your appeal or the bar appeal? My appeal. Six weeks or six months? Six weeks. So, is that based on the one-year suspension, the first case? That is based on the one-year suspension. It's for six weeks, actual suspension, probation for an additional year. And what's the status of reciprocal proceedings on the second Nevada Supreme Court determination? That's a very interesting question, Your Honor, because they've been on notice now for many months, and there's no, I've seen nothing. I think that's a good sign. However, I can't really say that it really has any true significance, but that's it. Nothing so far. Okay. So, proceed. I'm first going to address my disability, and I'm sure the court knows that in January of 2011, I had a, I don't call it an illness, it was more like something related to a stroke, which has pretty much been ruled out at this time, but it was feared at the time I'd had a stroke. My doctor, as, do I need to move to admit the exhibits? No, we can accept everything. My doctor told me at that time, as it's recorded in the records, do not return to work. At the time, my partner was in Santa Barbara. We kept a place in Santa Barbara. Where in the documents that you provided, is there evidence that you received an order from the doctor telling you not to work? A, medical records from Veterans Administration. I believe it's page 10. And Dr. Lemon. Hold on. I have that here. I'm going to try and locate that. You said page 11? Page 10, I believe. Page 10, okay. I believe. Okay, so I have page 10 here, which looks like lab results to me. Dennis Lemon, lab results. And I apologize, I should know that. I thought it was page 10, maybe it's page 11. There's some boxes checked. And one of the boxes checked says, I think it's checked, it says do not return to work. Okay, so it says here on page 12, follow-up care, return to team is checked. Return to ED if condition changes or worsens. I take it that's emergency department. And then it says activity after follow-up care. And then it says check no work, duty, or school until. And then it's not filled out. And that's what it didn't, he did not say you can go back to work in a week or two weeks. He said follow-up with your doctor in Santa Barbara. Right, so this is January 28th of 2011. So, and is there any further medical determination other than this page, addressing your ability to work as determined by a medical professional? In the records, I was seen approximately 12 times, I believe, in the following few years. I last saw my doctor two days, on Friday, I believe. And I'm going to address that in just a second. But I also have an appointment to see some other professionals, these are psychologists, on Friday, this coming Friday, in two days, or three days. But to cut to the chase, I was instructed to go see my doctors, or the VA doctor in Santa Barbara, which I did within a matter of a few days, as soon as I could get down there and make an appointment, I did. And I have been tested for just about anything imaginable that could be related to a neurological condition. And I continue to be tested. My understanding is now that although it's impossible to specifically detect it, perhaps in doing a slice of your brain up in pieces, that I suffer from what is called either post-concussive disorder, or also called traumatic brain injury, and also called chronic traumatic encephalopathy. So, is there any documentary evidence that you've submitted, other than what we just looked at on page 12, that reflects a medical determination that you not return to work? That was the only time it's been discussed. In fact, I did return to work without getting instructions from a medical doctor to do so, because I had a choice of completely abandoning all of my clients, or what I did do was abandon about, and I shouldn't say abandon, because all of those that I could refer to other lawyers I did, the ones I couldn't find a lawyer to take, those are the ones I sent a letter and I said, I can no longer represent you, you need to find somebody else. Your assessment of your own medical situation, based upon your discussions with medical professionals, and your own self-knowledge, is that at the relevant times of this, that were covered by these disciplinary proceedings, you were capable and competent to perform the duties of a lawyer, at least part-time, shall we say, but perhaps not able, because of your medical condition, to continue the full-time practice that you had done before? Is that fair? It's an estimate of what you did? Very accurate. All right, okay, good. If I can, this is not in the record, but I'd like to explain that this traumatic brain injury from which I suffer, I believe that's what it is from what I can pull in my studies, is the same thing that is going on with the NFL players, and it's a large new discovery that these NFL players suffer certain symptoms as a result of repeated blows to the head, but what I can also tell the court is it's not new, it's been received a lot of attention in the past 10, 15, 20 years, but it's not new, it's been out there forever, and it's called punch drop. Boxers have had that problem for many, many, well, forever. It's very common in boxers, and my experience is not playing football. I'm a boxer, and I've been in many, many fights. I was a cop, and it just proves I'm not very bright, but it's the fact that I have suffered many concussions, and that has concerned me because, as the court mentioned, am I competent to represent my clients? As I went back to work, in some cases, I was very careful to involve other lawyers as much as I possibly could. Is there any evidence? I confess I didn't read all the medical evidence, maybe because some of it seemed like it was not really within my ken, but is there any reference in those medical documents to prior history of head trauma? Oh, that's referred repeatedly. I mean, I didn't include all of my records, but it's referred to in the medical records that you do have. All right. That was then, really, there was no reason for me to have these symptoms because the first thing they did was check my heart, they checked my circulatory system, they checked my lungs, they checked my brain with scans, and there's nothing. They said, wow, your brain looks good. Oh, excuse me. All right. Okay. Please continue. And that is what happened with the Nevada Bar, is the Nevada Bar, despite no evidence to the contrary, found that, in the words of the Nevada Supreme Court, who adopted the term, I think, from the bar, is that this was a self-imposed medical leave, which, in fact, was not. I've testified before in both hearings that it was not self-imposed. It was pursuant to the instructions of Dr. Lemon. The Nevada Bar first called me and said, we have some complaints from your former clients. We're recommending that you, pursuant to Rules of Discipline 17.1, I believe, you take a six-month leave of absence because you apparently have some sort of a medical condition. You need to get over that. And my response was I would be abandoning my clients, at least some of them. I did, in fact, abandon some, and others I stayed with based on what I felt was they're the ones who had the most serious cases and the ones who would be the worst, would be injured more than the others. And I would point out to the court that my history is primarily civil rights and criminal defense and some personal injury. I kept mostly, I think I spent most, at least lately, after this, I spent most of my time doing civil rights cases. And I point that out because I represent convicts, cops, low-level employees, people who would not have the wherewithal to pay some lawyer to take the case. So I ended up mostly with some civil rights cases and maybe a few criminal defense cases, all of which that I felt it was necessary for me to keep those cases and not follow the demand that I hang up my shingle for six months. Turns out, as it happened, I was suspended for three years. And that still has yet to be addressed fully since we're in front of the California bar, which I think that would be speculative at this time. I'm just saying I'm quite confident, and that is why I did what I did, because of the nature of my clients and the nature of the cases and the fact that we weren't going to, I wasn't going to be able to find somebody to treat them right. And I have not had a problem representing anyone since then, and I've been very careful to keep other attorneys involved, and I continue to do that. I only have a few clients now with one very complex case or set of cases for one client, and I have at this point two or three other attorneys involved in those cases. Before that, I've had even more attorneys involved. So as far as the court's concerned, rightfully so, that I may not be entirely confident, I've satisfied myself that I can perform adequately, more than adequately, and I mentioned to the court that this Friday I have a follow-up with a psychologist or a couple of psychologists who have already given me some indication that I'm doing okay. But on Friday, we're going to go over it in detail, and they've tested me just about for anything you can imagine testing, because there is no physical test or medical diagnosis that's going to be definitive. But this particular set of tests will confirm that my cognitive powers are adequate, at least adequate, or better. So that's the answer to that question. And I would also, as far as my health is concerned, indicate to the court that after January 2011, my condition continued, the same condition that I was having problems with. Gradually, it's gradually improved until today and continues to improve, which I didn't mention the other thing. Besides the TBI or traumatic brain injury, they've also diagnosed me as suffering from PTSD, which you wouldn't think of it as affecting one's physical health, but in fact it does, I've learned. And so I'm dealing with that, as well as some other problems that are not dementia-related. No one's told me that I have some sort of dementia. They do say that it appears to be a TBI case and that there's a PTSD factor involved. But traumatic brain injury, it's also called chronic traumatic encephalopathy, and it's also called post-concussive disorder or post-concussive syndrome. Thank you. And in the old days, before it was discovered in football players, it was called pugilistica dementia, which means you're functional, which has long been recognized. Thank you. Even though it's in there in the record, I would like to expound a little bit on the three levels or the three hearings that were conducted in Nevada. The first hearing was conducted prior to January 2011, and that hearing had alleged that I failed to properly serve a client by not filing a discovery report. And I went to that hearing and established unequivocally that that was a fraudulent complaint by the Bar Council because I had, in fact, filed the necessary report. The entire matter was, I don't know why the Bar even went forward with that, because they found that there was no discipline merited. I did get some sort of a cautionary note, which does not constitute discipline. The second hearing, and just by way of history, involved some very damaging testimony from another lawyer who had accused me of not making a sufficient record to take the matter to the Ninth Circuit, which was totally false and there was no finding by the Nevada hearing board that I had done that, but it was alleged, and that I also probably, I don't remember the exact words, but in essence probably was bribed to throw the case by the insurance company, that the insurance company bribed me. And that was just an out-of-the-blue-sky allegation by this lawyer who was acting as a pawn for the state bar. In the third hearing that is the subject matter of this case, the state bar and the assistant to the state bar council actually took a witness in the back room and had a witness sign an affidavit that was presented to the board that this affidavit was concerned with my address. And it was a blatantly false statement by this witness, and it wasn't done with lack of knowledge or by mistake by bar council because they were quite familiar with what my address had been for the past several years, and despite that they assisted, typed up the affidavit, and had this witness sign this false affidavit. I bring up this because, and I often see people that say, you know, they're out to get me. And, you know, it's like I always say, though, you probably are paranoid, but they really might be out to get you. And the truth of the matter is I have never made any bones about it. I have been very vocally critical of judges, other lawyers, prosecutors, police departments. My career has involved, including my police career, has involved criticizing the system. That's what I've always done as a cop. I started in 1983 or 84, I started a grand jury investigation of the police department for whom I worked, for which I worked. Anyway, I bring that up because I have been very notorious in my activities. I've been very outspoken, and as my wife will tell you, I have no filter. So I've done this for years, and I was not real popular. There are, at this time, two retired judges and a sitting judge who I sued. And you can't sue a judge, but actually you can because these were things that weren't related to their judicial duties. So I sued the oldest or the senior judge in the state of Nevada, who I'm certain that didn't get me any friends. And then on top of that, not only did I raise some hackles there, but both of the two boards that found that I should be disciplined, both those boards were comprised of one former prosecutor who sat on both boards, and the other two boards had prosecutors, two prosecutors. One ethics commission, it's a prosecutorial agency in Nevada, and the other one was the district attorney's office with whom I had a record of contentious dealings with over many, many, many years, both as a cop and later as a lawyer. So I bring that up because I'm raising, I think I properly raised it in my documents, a sort of a Batson challenge that the boards were comprised of people selected by the state bar who would not be impartial and would have had a bias against me since I had so much history with prosecutorial agencies over the years. And I pointed this out in one of the documents, one of my briefs, but at the second hearing, Mr. Reeser, who was the chairperson, former prosecutor from the AG's office, grew rather impatient because of some of the things I was arguing, which primarily were the violation of the United States Constitution, which was mostly due process and First Amendment arguments, and he said in a rather heated fashion, we'll leave, I'm not quoting him directly, but essentially what he said was, we'll leave that up to the Nevada Supreme Court to decide. And the Nevada Supreme Court didn't decide it. If they did, they decided it by ignoring it. There was never in anything, any order, any ruling on the issues that I raised regarding constitutional safeguards. At the same time, they failed, and it is again in the record, they failed to address or follow the rules of civil procedure, which they are required to by their own rules, as far as notice and hearing, because this doesn't apply directly to the second hearing, but the first hearing they failed to serve notice as to one of the witnesses and provide the document which she had prepared, this letter by the attorney who testified or said in the letter that I was on the take from an insurance company and that I had failed to make a proper record, both of which were lies. But I raised that because that didn't just happen there, but throughout both these hearings they did not follow the rules of civil procedure, which again gets to the issue of due process. Nor did anyone ever address the issue of disability, which in particular applies in the state of California. It's an issue before the state law now. I believe that I have a disability, and it's unquestioned that the state court in Nevada decided I had a disability because they told me that I needed to follow the disciplinary rule 17.1, which required a six-month leave of absence and don't practice law for six months until you feel or they decide you're doing okay. That was never done. They never had any sort of finding at all that I had a disability and in essence have decided, I guess they've decided I don't have a disability even though they told me that I had a disability. The fact of the matter is I'm viewed as having a disability, which falls under the protections provided by the ADA. And at this point it's been made clear to me that I have a disability, a disability that requires me to work less and take better care of my physical health, but it's not something that provides or prevents me from being adequately representing clients. I'm going to cut it short there. One other thing is I've been practicing in front of the Ninth Circuit Court of Appeals since I started practicing and probably in my last, I mean it takes a couple years to get here, but I started in 1988 and in California in 1989. I've been to this court four times and I count. I could count, but I lost track. But I would ask the court to take judicial notice that, and I don't want to misspeak here, but I know that I've had six cases out of my last maybe seven or eight cases that were decided here after I briefed and argued those cases. I've prevailed in six cases. There are cases where Marshall is my client. You had a list of these, didn't you? I think they're on my CD, which is high. I recall seeing that. So I won't say I don't like to brag because I really do like to brag, and the fact of the matter is I've been very successful over the past, my entire legal history, in front of fellow courts, including the Nevada Supreme Court, even after January 2011. And all of the cases, of the six cases that I've recently been successful with, let me see, yep, six cases, all of those cases except, I think, one, I was representing the appellant. And as this court's, the Ninth Circuit has mediators that try to settle our cases before they're actually even briefed, one of their favorite lines is, you know, nine out of ten cases that get appealed are unsuccessful in front of the Ninth Circuit. Well, I think all of these six cases I had lost at the lower court and was successful in getting the Ninth Circuit to overturn those decisions by the lower court. And I think I would challenge anyone to find a better record in front of the Ninth Circuit than I have recently. I haven't always been that successful, but I've been successful over the years, I think, probably in excess of 50 percent. And I might be wrong on that, but it's pretty good. I mean, I've got a good record there, and I'm quite proud of it, and I continue to feel I'm as competent or more competent. Anyway, that's it. I would invite any questions. Now comes the grueling cross-examination. So the medical records that you submitted here were never submitted to the State Bar, is that correct? That is entirely correct, and I would like to address that, if I may. Yes, please do. When I turned 65, I lost my insurance that was provided by the City of Reno for a police officer. So I, at that time, being very healthy, I decided I don't need insurance other than I'll use the Veterans Administration because I'm a vet, and I did. And when I first went to see the vets, I didn't see anybody for a couple of years, but when I did in January, and when I attempted to get those records, I couldn't get the records. It had been my experience before that, that if you want to get records from the VA, good luck. The truth of the matter is that's been changed. In the last several years, it's become easy to get your records. I can go and grab records. I just go to the hospital, wherever it was that I went, and I will find your records. Prior to that, prior to the two hearings I had, I had asked for my entire set of records and had never heard back, which happens a lot with the VA. It is run by the military, or semi-military. Anyway, so I wasn't able to get those records. Those records that are in this package were never presented. I testified as to what I'd done, what tests had been run, and I put on two or three witnesses that testified about my medical condition. These were lay witnesses, correct? These were not doctors. No, they were people who had, one was my brother who worked for me, and one was a good friend slash client of mine who I'd known over a period of years, and they both testified as to their observations. The State Bar Council addressed that as Mr. Bowles has been down in Santa Barbara, kicked back on his yacht with his feet up for the last year and a half. That was how he addressed my... Did you take any other steps to try and obtain medical testimony or evidence? I mean, you were seen by Dr. Lemon. Did you ask him for an affidavit? I did not, other than I didn't ask for an affidavit, no. I could possibly have put him on as a witness, but at the time it wasn't even an issue that I'd been told by a doctor. However, this came up during the hearing that I'd been told by a doctor not to go back to work. It came up during the hearing that, well, you just quit seeing your clients and there is no evidence that you... The fact of the matter is the State Bar didn't even look into it. They just said, where is it? Yeah, where is it? At what point did the State Bar offer you the option of becoming inactive under that rule? 17.1, I believe, or 17.1. I have rule 117. Yeah, I'm sure it is. Okay, so when did they offer you this six-month escape clause? They offered that right out of the box. So this was before the hearing? Before anything. Okay, so everybody knew that medical condition was an issue. They're the ones who pointed it out. Right, so if your position has been that because of medical necessity you weren't able to perform at 100% capability, why didn't you make more effort to get that medical evidence in front of the State Bar? Well, to be perfectly frank, when I went off on medical leave, pursuant to what I'd been told, it would have cost me a couple thousand dollars to bring a doctor in and testify. I mean, that's my experience in trying cases. And I had no income for a period of, or very little income for a long period of time. I just, I could have subpoenaed Dr. Lemon, but since it was never at issue that I had a medical condition, nobody ever questioned that until I got to the hearing, and then it became an issue. And when I went to the second hearing, I made it a point to put on some witnesses who'd observed me. I also gave them, I provided a list of every appointment, every test that had been conducted over a period of about two years. So again, it was addressed. I didn't have the wherewithal to hire a medical expert to do a workup and come in and testify that, sure, Mr. Bowles has post-concussive syndrome, or TBI, because that, I know very well what it costs. Well, let's assume that you could have presented the medical records. Do you suppose that it would have made a difference in the determination? Let's say they had that indication that there was a medical professional who said, I do not return to work. Should there have been a different result? Absolutely. Do I? So let me ask you this question then. What is the legal basis for a medical defense in your case? I mean, you had witnesses testifying as to certain matters that were credited by the state or, rightly or wrongly, they credited some of that witness testimony against you. So if you had this determination of medical, at least some medical indication, it wasn't a self-imposed leave, but a medically appropriate or directed leave, and then counterbalanced with your clear belief that, notwithstanding that one document that Lemon had at that time, you were fully capable of managing some of the cases. So what's the legal analysis, the legal significance of this, well, should we say partial medical disability as a shorthand for what you've been encountering? So let's say that there was not this self-imposed stigma to it, but simply the notion that Bowles has a medical condition. He can work part-time, but not full-time. How does that play in legally to the assertions by the witnesses, Thompson and Sinus, that were credited by the bar? How does that save you? Very, their entire position, their prosecution was based on this idea that this was a self-imposed, unmerited medical leave, and I didn't have the right to be on medical leave because I was on my yacht in Santa Barbara with my FIDA. That was their position throughout. That's the way it started, and that's the way it stayed. My understanding is that their position was, even if you had some form of medical disability, you were still compelled to take steps to protect the legal rights of those clients that you had. You had an ethical obligation to take certain steps to ensure that they were taken care of, that your clients were taken care of. So I guess what I'm looking for is where the, aside from any characterization of you as what you're doing, but just stripping it down to its essence, what effect does this medical disability have? Is there, I guess what I'm asking, is there a medical excuse, assuming that their fact-finding is correct, is there a medical excuse for you not taking the steps that a lawyer is ethically required to take in order to protect clients? Well, there's the great fallacy because no one was totally abandoned. Every one of those clients was able to keep in touch with my office, and my office was a telephone in my brother's house, and he answered it for me, he worked for me. Clever pairing, Mr. Bowles. What you're now telling me is, well, there's really no merit to those factual assertions, and none of these clients had a basis for, or shall we say that the State Bar did not have sufficient basis for finding that there was validity to these complaints against you because you took steps that were fine. And that's another issue. We'll get to that in a moment. But what I'm probing here is the actual effect of the medical disability that you've talked about. And let's just assume for purposes of this part of the argument that the Bar was entitled to credit their testimony and come up with their determination. Assume that's true. As you endorse that view, just assume it for the purposes of this argument. So then the question I'm having with respect to your medical condition, the TBI, and let's assume that it's been already diagnosed or we have credible evidence that there's TBI here and that there's a disability of some sort. Does that give you a defense? Most certainly. Okay, and on what basis? On the basis of I did what this particular set of facts. It's a factual issue. I did what was appropriate considering that I'd been told to go on medical leave, not partial. Go on medical leave. And I took whatever steps were necessary to protect those clients until such point, which is a matter of quite a few months. I took the necessary steps to protect each and every one of those cases. Nothing was dismissed. And at some point I reached the conclusion that I wasn't going to be able to protect my own health. And you're on your own, Mr. Thompson. You've got to go hire a new lawyer. You're on your own, Ms. Graber. You've got to go hire a new lawyer. And the record is, I think, more than clear that I did take the necessary steps. What Mr. Reeser thought or opined was that I should have sent out a blanket letter to all my clients and talked to each and every one of those clients right out of the box. Well, that was the list of things you might have done in his decision. In his decision. You might have done this, this, and this. All right. Let me ask another question. So I perceive two lines of argument that concern the medical disability. And I'm not sure that I can find that they're consistent. And maybe I've been misreading what you're getting at here. So on the one hand, I think I'm reading that you're claiming you're being discriminated against on the basis of your disability. I am. And then the second argument I'm seeing is that the panel thought that you were not actually suffering from a medical disability but were pretending or you were self-imposing a medical disability. So I see those as somewhat inconsistent from a logical standpoint of what the state bar could conclude. I mean, either they conclude that you have a medical disability and that you didn't do any of the things that you should have done with somebody with a medical disability. That's one argument. Or, you know what, Bowles doesn't really have a medical disability. He's pretending to have a medical disability. So he has really no basis. So I don't see that those two can coexist. And I'm just wondering whether you have some way that you can explain that they can coexist or how you're reading the main thrust of the bar. Do you understand what I'm getting at? I do. I do. And I don't know whether this is something you've thought about in those terms. And it may be that really one of them is what's really at stake here and the other is not so much at stake. Or maybe you can tell me that they are actually both at stake at this point. The facts here support that I was on medical leave and was instructed to do so by Dr. Lemon. And the bar took the position, after I refused to do the Rule 117 leave of absence for six months, they took the position that even though you're on medical leave, you should not have been on medical leave. You should have continued to perform, which was their position. I mean, throughout this hearing and the other hearing, my position was I was on medical leave. That means you're on medical leave. You don't take phone calls. You don't go to court. You don't write briefs. Their position was you should have continued to work. And in order to reach that conclusion, whether they said so or not, they had to not believe that I had a disability. My position has always been the same. I had a disability. I was told to stay off work. I stayed off work. When I could, I went back to work in a limited fashion. That was always my position. And the contradiction here is by the bar. The bar contradicted itself. Okay, I'm getting from you your sense, the sense that the primary theme at the hearing was you're not really medical disability, but you're pretending to, so we don't really have to give you the kind of accommodation that we might give somebody who actually was disabled. I get that. But then how can you also contend that you were being discriminated on the basis of disability if they didn't believe you were disabled? How can they discriminate against you on the basis of disability? Well, see, that was the prosecutor's position was, yeah, I know he's disabled. He went to the hospital. He spent some time in the hospital. He's got all these problems. He believed that. There was no question in my mind because he wanted me to take this medical leave of absence. But he sold the board a bill of goods. He sold the board on this position because I didn't go along with his recommendation. He said, well, we'll show you. You're down on your yacht kicking back. Okay, I understand that. You've explained that. And I know it sounds cuckoo, but the truth of the matter is they don't call Nevada the Mississippi of the West for no reason. There's good reason for that. So at the time that they offered you this Rule 117 six-month period, did they make any representations about the status of the complaints they were investigating? Oh, yeah. They said the complaints will just go by the wayside. If you take the six months, you can come back in six months. All the complaints, at that time there was one or two left out there that hadn't been made. But they said the complaints will be considered moot or deferred prosecution in essence. Your penance is you do six months on the beach, and after that, you're okay. That's the way they like to work. They're like prosecutors everywhere, you know. Don't want to go to trial. Make a deal. All right. So you have this offer of six months to go on. In your statement, you described that you felt uncomfortable about taking them up on the offer because you didn't think that all the clients could get appropriately placed. That's correct. But my understanding of the California process under Rule 117 is that the State Bar, in their Supreme Court Rule 118, takes responsibility for placing all the clients with other lawyers. That's very interesting. I'm glad you brought that up because none of these clients, after I terminated them and after they were prosecuting me, nobody was provided with a lawyer. Well, you mean they had the – did the Supreme Court then have the responsibility, once you were suspended, to find new counsel for clients that were yours? Well, if, in fact, there had been some misconduct and those clients were somehow injured, and according to the State Bar of Nevada, they are to be provided with counsel. But that's not the case. They do not do that. And I know that. I've always known that. They don't have the wherewithal to do that. They can't pay some lawyer to represent somebody with a civil rights case who has no money. So do you have any authority for the statement you made that one, essentially, Supreme Court Rule 118 is ignored, never – it's not enforced, which is what you're saying, correct? Yes, and it's in the record. Where in the record does that look like? Well, it's in the record in the first hearing because Ann Vohl, V-O-H-L, was the lady who came in and testified against me. That's the other lawyer, right? That's the other lawyer, the one who said I was taking bribes. Okay, and? And she did one of the most shoddy – and she was referred – the client was referred to Ann Vohl. And she wrote a letter to the client that said, you do not – this letter was the letter I'm speaking of, where there was just blatant lies in it, and it was also redacted, by the way, which it was redacted and I've never seen the full letter. Who referred? The State Bar referred to Ann Vohl. And how did the client get referred to Ann Vohl? Well, they said, here, call this lady. They assigned her under Rule 118, though? I don't know if it was an assignment per se, but they referred her to Ann Vohl, who then wrote a letter. And was this a former client of yours? It was the client who made the complaint, Roy Graber. So they did. I'm still looking. Where's the tie-in to Rule 118? Well, 118 provides that the State Bar will provide counsel to these people, but they don't have counsel who are competent, and they don't pay them. So Ann Vohl got referred, Roy Graber, who went to Ann Vohl, who wrote a letter that said, Mr. Bowles did not make a record, so your case in the Ninth Circuit can't go forward, which was a lie. Mr. Bowles is probably being bribed by the insurance company, which obviously, again, is a lie. They don't have attorneys. They have attorneys they refer to, but it doesn't mean that those people are going to be properly taken care of, especially when my clients include a couple of one convict and another guy who'd been arrested by the police. You can't find attorneys in Nevada who will take on these cases. They can't refer those cases, not the kind of cases I have. Okay, let me move on to another topic, and that is the question of recusal, at least of Mr. Rieser. And so what statements or rulings of his do you think established a basis for recusal as a matter of law? He had already ruled on cases in the first case, the first case that netted me a year on the beach. He'd already ruled on cases in that case. In other words, they brought in the case. There were six charges against me, three in the first one and three in the second. He had already ruled on the second three, not all three of them, but he considered them as aggravating factors. In the first hearing, he considered the counts that were in the second thing, and is that in the record? It is in the record. He had considered the Thompson case, and he'd considered the Simon case. And what legal authority is for that to be a basis for recusal? Well, a legal authority would be Loudermill, which Loudermill versus Milwaukee Board of Education, I believe, that provides that you must have an impartial hearing entity. And the fact that, a little aside, I tried a case to Judge Ed Reed, who's one of the most respected federal judges anywhere. I tried a case with that being the big factor. And so I'm very familiar with impartiality of the hearing board, and in that particular case I tried. This is an example. One of the city council people had previously decided to get involved in the case before he heard it. And because this city council person, who was part of the hearing board, had already decided, or been involved, not even decided, but just been involved, the jury found that it was not an impartial hearing board, and that we prevailed on that case. So my legal authority is Loudermill, and its personal experience of a jury member would be an automatic bar to that person sitting on the board. And, of course, this wasn't a jury, but in essence it was a jury. Okay, let me move to another topic. So you are also making the argument that the evidence was essentially insufficient to support the charges against you, and I want to focus on the Thompson and Phoenix matters. And let's start with Mr. Thompson. And I'm trying to find out from you specifically what was unbelievable about Mr. Thompson's testimony, or why it otherwise was not sufficient to support the conclusion that the state barged. Well, in the case of Mr. Thompson, he made it clear from the very beginning that he was interested in one thing and one thing only, and that was getting his money back. He had paid me $2,000. I had probably done $10,000 to $20,000 worth of work for him, but he wanted that money back. And his position was Mr. Bowles should continue to represent me. And that was not incredible at all. That was his position. That's what he testified to, that I should have continued to represent him or give him his money back. How they found that my refusal or choice not to continue as his counsel constituted misconduct, but that's what they found. And, of course, what they said was, well, you didn't communicate with him. Well, of course I didn't communicate with him. I was on medical leave, and once I decided I couldn't continue at the same pace, I said, here's a letter that says you have to go find new counsel. And he wanted his money back. Let me just backtrack a moment here, because you've been maintaining that you felt like you were able, I think, pardon me if I'm wrong, but I think you were saying that you had this directive not to work by a medical professional. You evaluated your own capabilities, and you determined that despite that legal advice, you were able to work to some extent, and that you were going to keep some of your cases, those where your own participation was uniquely appropriate, and that in those cases you felt confident that you could discharge all of your obligations. So now with Thompson, now you're telling me that because of your medical situation, you were unable to communicate with him fully. And I was told, go back to work. Part of that, that to me meant you don't take phone calls, you don't write briefs, you don't do anything, you don't make appearances or anything. At the point that I had decided that I could no longer represent Mr. Thompson, I informed him and said go get another lawyer. The truth of the matter is I did not communicate with him in that period of time between January 28th until sometime mid-summer, I did not communicate with him. And when he says that Mr. Bowles didn't answer my phone calls, that's a true statement. I didn't take his phone calls. Maybe one or two, but I didn't take phone calls. I had my office doing it. One of the complaints was lack of communication under the rule of professional conduct 1.4. You were obligated as a lawyer to communicate with your client. The client wants something. You relied on your medical situation. You don't communicate with them. So this gets back to that question I asked you earlier. Is that a defense? You made the unilateral determination that you were competent to continue as a lawyer to some extent. You knew that you had legal, I mean medical advice that you not work for some undetermined amount of time. Yet you kept on these cases. And I'm just, how could you then fault the bar for saying, well, you know, Bowles didn't communicate with his client. He was obligated to do so. But he didn't. And what you're telling me now is you made the decision out of your own free will, based upon your belief that you could continue to represent, and yet you didn't represent this person to the standards that are set forth in the State Bar Rules. And it wasn't a process of, wow, we think you had a stroke. Go get some follow-up. You should be hospitalized now. But if you want to go to Santa Barbara, it's your choice. That's where my partner was, was in Santa Barbara. And at that point, I quit working, period. I did exactly what the doctor said. Do not go back to work. At some point, I found that no medical tests were able to accurately diagnose what was going on in my head. And at some point, I did handle some cases on an emergency basis, very few. But I was doing as I'd been instructed by a medical doctor until all these tests said, we don't know what's going on in your head. At that point, I decided that I was going to essentially narrow my practice down to about 10% of what I'd been doing. And at that point, I informed my clients, you've got to get a new lawyer. And none of these clients had a problem with lack of communication knowing that I was on medical leave. They had a problem with getting their money back. That's what the whole thing was about. Let's go to – you've already explained or alluded to the affidavit that Ms. Acenas signed. And I'm familiar with the factual basis for the erroneous address argument. Is there anything else unbelievable about her story other than the timing, the date of the letter compared to the address? Her testimony was entirely trumped up. Her testimony was that she had been cut loose by me based on an agreement. We had gone to a hearing and decided that she didn't have a case anymore. She wasn't going to win this case. She had lost at the hearing level and the appeal was unsuccessful. So, we parted ways. She was no longer my client at all. I didn't even have a duty to her. You mentioned a case where she wanted to appeal and you thought that the appeal would be successful. No. We did have an appeal. We did appeal her case and she lost. Actually, at some point, we decided not to go to the Supreme Court with it. We went to judicial review. She lost her appeal and she wanted to take one more step and you thought that would be it. I told her, I said, I can't do it for you. You're not going to win. And we didn't have an appeal that was going to go any farther. And she said, okay, okay, we decided that. And here's her testimony a year later or two years later. We gave Mr. Bowles some money. We want it back. And I couldn't get a hold of Mr. Bowles. I still had the same address in Reno and she claimed that she had gone by the address and nobody was there, which might have happened because, you know, the office might have been closed that day. But she had a big hole in her case because she said she had sent me a letter. And after I had testified and the Bar Council knew I didn't have that address, they went in and made something up that she had sent the letter to an address that I didn't have until at least a year later. And that was a falsified affidavit with the assistance of counsel. It was just totally false. I didn't even know that address at the time. I'm familiar with that argument. So on what basis are you contending now that the State Bar should have accommodated you? In terms of your physical disability. Well, the State Bar should have just allowed me to do what I did, which was shrink my practice down to a manageable level. I understand that, but what's the authority for that? Oh, well, ADA and in California, which obviously State Bar of Nevada doesn't have to recognize, but there is a code, a California code, that provides you cannot, in licensing, which this is a case of licensing of some sort, you cannot discriminate based on disability. So is there any federal ADA cases that you're aware of that address this kind of situation, which would require a bar, a licensing board, a bar, to give accommodations to someone along the lines that were present here? I don't know, and I'll tell you why, is that my understanding, after reading the ADA carefully, is I don't know that there's any jurisdiction over a bar, a Nevada bar, deciding that we don't have to accommodate this person. I don't know that they are required to accommodate me. The only way that they would be is if they were receiving federal funds. And I've asked the bar to inform me if they got any federal money for the operation of the bar. I can't find where they have any federal money. So my understanding right now is that the Nevada bar does not have to accommodate me. They can do whatever they want. They can take my license because I am disabled. But having said that, California is subject to both the ADA and a California code that provides you cannot disable, I mean you cannot discriminate against someone with a disability. Next question. In the second proceeding, what specific assertions are you making that support the intention of prosecutorial misconduct? In the second hearing? Yes. The big thing was the Encina's affidavit, which that one could not go forward other than having that falsified affidavit. Anything else? Well, the position, the argument that I was not disabled was I think prosecutorial misconduct because he was on the record as having found that I qualified under Rule 170. The state panel was aware that you'd been offered that, correct? Oh yeah, I made a point of it. I rather vocally made a point of it. Imagine that. I don't doubt that. Oh, on the Rule 11 sanctions issue that Judge Navarro imposed, did you ever appeal the imposition of sanctions? I did not. And the reason I didn't is she never really sanctioned me. She referred it to the bar. Well, what about didn't she call for an attorney fee in that order? Didn't she say the defendant shall set out the fees and costs for this proceeding? And I was never... They never did so? I don't remember if they did so or not, but I never had to pay a dime. And Judge Navarro didn't find that I had done all those things that Mr. Simon had alleged. What she said was there was a Rule 11 sanction and there was no finding on the merits what I had done other than you are being found liable by default because I'd never responded to any of that. But then she said in response to your... Then you filed a supplemental filing and she said, well, you've now had an opportunity to address the issues and I conclude that you're now liable. She said, I'm not going to rule on your brief. I briefed it twice. She never addressed either one. She said, you're untimely. We're not going to consider it. And she said, I'm referring it to the State Bar of Nevada. So why didn't you appeal that order? Quite simply, at the time, I was... It was a period of time that I was not... I didn't have the time or the drive to do that. And the other thing is I intend to address that in an action in the State of California because there was no process. You're going to sue Judge Navarro in California? No, no, no. I'm just going to file something for injunctive relief with the State Bar. And I think that the State Bar... You're not going to enjoin them from considering that in their proceeding? Is that the idea? Part of it, yes. And any other part? Well, the other thing is... I just had a curiosity here. The other thing is the State Bar of California is ethically required to properly consider the actions here and the State Bar of California is given credence to the self-imposed medical leave. That's what they're hanging their hat on. And now that I have the records, the State Bar of California, I think, will be compelled to not consider the Nevada order. Okay, let's backtrack one step to the magistrate judge's award of sanctions and the motion to compel. That's part of the case. Now, you participated in the hearing on the motion to compel, correct? By telephone? I'm lost here. This is the motion to compel the discovery dispute in that... Evans case? Evans case. In the district court case, Evans. Right, right. So there was this discovery motion at the other side, a motion to compel discovery by the defendants. Wise, correct? Right. They filed a motion to compel a hearing with it. Now, my understanding is you participated in that hearing by telephone. By telephone. I had not been noticed. So how did you find out about the motion to compel hearing? I was walking by the federal courthouse, coming, I think, from lunch. I got a phone call on my cell phone and it was Judge Cook. And she said, Mr. Bowles, why aren't you here? I said, where? I haven't heard of anything. She said, there's a motion to compel. I said, I'm not even in that case. Mr. Evans had, we'd gone separate ways. I no longer represented him. And I had, he'd fired me like months before that. I wasn't even the attorney of record any longer and I'd been removed from that case. And I'm walking by the courthouse and Judge Cook says, there's a motion to compel. What's going on here? I said, I don't know a thing about it, Judge. I'd come in, but I'm in my jeans and a sweatshirt. And she said, well, we're going to proceed with this. And that's what happened. You just stayed on the cell phone? I stayed on the cell phone and walked back to my office. Were you still listed as counsel of record on the docket at that time? There had been a substitution filed. And at least she had it on her docket sheet. But I don't know why I was still there. I mean, why they still had my name. Were you registered for electronic filing? Oh, yeah, I was. I did not. Did you make that point? Oh, yeah. I said, I didn't get any of this stuff. All these motions? That's why I never responded to Simon's Rule 11 motion. Yeah, there was a lot of discussion about mailing addresses. So what I'm talking about is electronic notification. Because these days, your mailing address doesn't really matter that much, at least in our court and most district courts. This is a district court. Services by electronic filing, correct? CMECF? Right. Oh, yeah. And so it didn't matter what your street address was. The only real question is, did you receive electronic notice or not? I did not. Is that something that was discussed at the State Bar proceedings, this electronic filing matter? I said I didn't receive this by mail or electronic means or anything. That was my testimony. And Judge Navarro never took issue with that. She just said refer it to the Bar, and I'm not going to consider your late filing. Okay. So I was asking you about, a moment ago, about the Encinas testimony and about the letter. That was, according to you, manufactured in that session outside by the prosecutor. Now, the address that was listed in that Oak something, Oak View or something like address, that was your address at a later date, correct? After September of 2012, I did, at some point, use that address. Before that, during these times, this is your brother's address, correct? It's one of my brother's addresses. Okay, one of your brother's addresses. During the time there. Yes. Okay. Okay. So I don't have any other questions for you, and I think you've clarified the questions I had. I appreciate that, and I thank you for traveling here and appearing today. And what's going to happen now is I'm going to, again, take a look at the record in light of the comments, testimony, and arguments you've made today, and then I will be issuing a report and recommendation, and that will be served on you. And you'll have an opportunity, if you so choose, to file whatever comments, objections, hurrahs, or lynching kinds of thoughts that you may have. So that is filing by you, plus my report and recommendation will then go to a three-judge panel, and they'll have all that before them. They'll have access to the entire record as well, and they'll make the final decision in the case about whether or not to impose reciprocal discipline in this case. All right? And if it goes to Judge Hugg, I'd appreciate it if you didn't mention Mississippi of the West. It's in the record already. Sorry. It will not be part of my report and recommendation. And I'm kidding. I stand by it. They are the Mississippi of the West. I would not expect you to say anything other than that. All right. Well, thank you again. And so this matter is then submitted pending the preparation of the report and recommendation. Thank you for appearing. Thank you for your patience. All right. Thank you.
judges: Appellate Commissioner Shaw